UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION at LEXINGTON

CIVIL ACTION NO. 07-92-GWU

ARLEN C. MULLINS,                                                          PLAINTIFF,

VS.                                    **MEMORANDUM OPINION**

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,                            DEFENDANT.

**INTRODUCTION**

The plaintiff brought this action to obtain judicial review of an administrative

denial of his applications for Disability Insurance Benefits (DIB) and Supplemental

Security Income (SSI).  The appeal is currently before the court on cross-motions

for summary judgment.

**APPLICABLE LAW**

The Sixth Circuit Court of Appeals has set out the steps applicable to judicial

review of Social Security disability benefit cases:

1.    Is the claimant currently engaged in substantial gainful activity?
      If yes, the claimant is not disabled.  If no, proceed to Step 2.
      See 20 C.F.R. 404.1520(b), 416.920(b).

2.    Does the claimant have any medically determinable physical
      or mental impairment(s)?  If yes, proceed to Step 3.  If no, the
      claimant is not disabled.  See 20 C.F.R. 404.1508, 416.908.

3.    Does the claimant have any severe impairment(s)--i.e., any
      impairment(s) significantly limiting the claimant's physical or
      mental ability to do basic work activities?  If yes, proceed to
      Step 4.  If no, the claimant is not disabled.  See 20 C.F.R.
      404.1520(c), 404.1521, 416.920(c), 461.921.

1

07-92  Mullins

4.      Can the claimant's severe impairment(s) be expected to result in death or last for a continuous period of at least 12 months? If yes, proceed to Step 5. If no, the claimant is not disabled. See 20 C.F.R. 404.920(d), 416.920(d).

5.      Does the claimant have any impairment or combination of impairments meeting or equaling in severity an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Listing of Impairments)? If yes, the claimant is disabled. If no, proceed to Step 6. See 20 C.F.R. 404.1520(d), 404.1526(a), 416.920(d), 416.926(a).

6.      Can the claimant, despite his impairment(s), considering his residual functional capacity and the physical and mental demands of the work he has done in the past, still perform this kind of past relevant work? If yes, the claimant was not disabled. If no, proceed to Step 7. See 20 C.F.R. 404.1520(e), 416.920(e).

7.      Can the claimant, despite his impairment(s), considering his residual functional capacity, age, education, and past work experience, do other work--i.e., any other substantial gainful activity which exists in the national economy? If yes, the claimant is not disabled. See 20 C.F.R. 404.1505(a), 404.1520(f)(1), 416.905(a), 416.920(f)(1).

Garner v. Heckler, 745 F.2d 383, 387 (6th Cir. 1984).

        Applying this analysis, it must be remembered that the principles pertinent to the judicial review of administrative agency action apply. Review of the Commissioner's decision is limited in scope to determining whether the findings of fact made are supported by substantial evidence. Jones v. Secretary of Health and Human Services, 945 F.2d 1365, 1368-1369 (6th Cir. 1991). This "substantial evidence" is "such evidence as a reasonable mind shall accept as adequate to support a conclusion;" it is based on the record as a whole and must take into

2

account whatever in the record fairly detracts from its weight.  Garner, 745 F.2d at 387.

One of the detracting factors in the administrative decision may be the fact that the Commissioner has improperly failed to accord greater weight to a treating physician than to a doctor to whom the plaintiff was sent for the purpose of gathering information against his disability claim. Bowie v. Secretary, 679 F.2d 654, 656 (6th Cir. 1982).  This presumes, of course, that the treating physician's opinion is based on objective medical findings.  Cf. Houston v. Secretary of Health and Human Services, 736 F.2d 365, 367 (6th Cir. 1984); King v. Heckler, 742 F.2d 968, 973 (6th Cir. 1984).  Opinions of disability from a treating physician are binding on the trier of fact only if they are not contradicted by substantial evidence to the contrary.  Hardaway v. Secretary, 823 F.2d 922 (6th Cir. 1987).  These have long been well-settled principles within the Circuit.  Jones, 945 F.2d at 1370.

Another point to keep in mind is the standard by which the Commissioner may assess allegations of pain.  Consideration should be given to all the plaintiff's symptoms including pain, and the extent to which signs and findings confirm these symptoms.   20 C.F.R. Section 404.1529 (1991).   However, in evaluating a claimant's allegations of disabling pain:

> First, we examine whether there is objective medical evidence of an underlying medical condition.  If there is, we then examine:  (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

3

Duncan v. Secretary of Health and Human Services, 801 F.2d 847, 853 (6th Cir. 1986).

Another issue concerns the effect of proof that an impairment may be remedied by treatment.  The Sixth Circuit has held that such an impairment will not serve as a basis for the ultimate finding of disability.  Harris v. Secretary of Health and Human Services, 756 F.2d 431, 436 n.2 (6th Cir. 1984).  However, the same result does not follow if the record is devoid of any evidence that the plaintiff would have regained his residual capacity for work if he had followed his doctor's instructions to do something or if the instructions were merely recommendations. Id.  Accord, Johnson v. Secretary of Health and Human Services, 794 F.2d 1106, 1113 (6th Cir. 1986).

In reviewing the record, the court must work with the medical evidence before it, despite the plaintiff's claims that he was unable to afford extensive medical work-ups.  Gooch v. Secretary of Health and Human Services, 833 F.2d 589, 592 (6th Cir. 1987).  Further, a failure to seek treatment for a period of time may be a factor to be considered against the plaintiff, Hale v. Secretary of Health and Human Services, 816 F.2d 1078, 1082 (6th Cir. 1987), unless a claimant simply has no way to afford or obtain treatment to remedy his condition, McKnight v. Sullivan, 927 F.2d 241, 242 (6th Cir. 1990).

Additional information concerning the specific steps in the test is in order.

Step six refers to the ability to return to one's past relevant category of work. Studaway v. Secretary, 815 F.2d 1074, 1076 (6th Cir. 1987). The plaintiff is said to make out a prima facie case by proving that he or she is unable to return to work. Cf. Lashley v. Secretary of Health and Human Services, 708 F.2d 1048, 1053 (6th Cir. 1983). However, both 20 C.F.R. 416.965(a) and 20 C.F.R. 404.1563 provide that an individual with only off-and-on work experience is considered to have had no work experience at all. Thus, jobs held for only a brief tenure may not form the basis of the Commissioner's decision that the plaintiff has not made out its case. Id. at 1053.

Once the case is made, however, if the Commissioner has failed to properly prove that there is work in the national economy which the plaintiff can perform, then an award of benefits may, under certain circumstances, be had. E.g., Faucher v. Secretary of Health and Human Services, 17 F.3d 171 (6th Cir. 1994). One of the ways for the Commissioner to perform this task is through the use of the medical vocational guidelines which appear at 20 C.F.R. Part 404, Subpart P, Appendix 2 and analyze factors such as residual functional capacity, age, education and work experience.

One of the residual functional capacity levels used in the guidelines, called "light" level work, involves lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds; a job is listed in this category if it encompasses a great deal of walking or standing, or when it involves sitting

most of the time with some pushing and pulling of arm or leg controls; by definition, a person capable of this level of activity must have the ability to do substantially all these activities.  20 C.F.R. 404.1567(b).  "Sedentary work" is defined as having the capacity to lift no more than ten pounds at a time and occasionally lift or carry small articles and an occasional amount of walking and standing.  20 C.F.R. 404.1567(a), 416.967(a).

However, when a claimant suffers from an impairment "that significantly diminishes his capacity to work, but does not manifest itself as a limitation on strength, for example, where a claimant suffers from a mental illness . . . manipulative restrictions . . . or heightened sensitivity to environmental contaminants . . . rote application of the grid [guidelines] is inappropriate . . ." Abbott v. Sullivan, 905 F.2d 918, 926 (6th Cir. 1990).  If this non-exertional impairment is significant, the Commissioner may still use the rules as a framework for decision-making, 20 C.F.R. Part 404, Subpart P, Appendix 2, Rule 200.00(e); however, merely using the term "framework" in the text of the decision is insufficient, if a fair reading of the record reveals that the agency relied entirely on the grid.  Ibid. In such cases, the agency may be required to consult a vocational specialist. Damron v. Secretary, 778 F.2d 279, 282 (6th Cir. 1985).  Even then, substantial evidence to support the Commissioner's decision may be produced through reliance on this expert testimony only if the hypothetical question given to the expert

accurately portrays the plaintiff's physical and mental impairments.   <u>Varley  v.
Secretary of Health and Human Services</u>, 820 F.2d 777 (6th Cir. 1987).

### DISCUSSION

The plaintiff, Arlen C. Mullins, was found by an Administrative Law Judge (ALJ) to have "severe" impairments consisting of an acromioclavicular joint dislocation of the right shoulder (status post surgery on January 3, 2003), recurrent dislocation of the clavicle at the acromioclavicular joint, major depression with a history of some bipolar symptoms, substance abuse, and borderline intellectual functioning.  (Tr. 24).  Nevertheless, based in part on the testimony of a Vocational Expert (VE), the ALJ determined that Mr. Mullins retained the residual functional capacity to perform a significant number of jobs existing in the economy, and therefore was not entitled to benefits.  (Tr. 27-31).  The Appeals Council declined to review, and this action followed.

At the administrative hearing, the ALJ asked the VE whether the plaintiff, a younger individual with a ninth grade education and unskilled work experience, could perform any jobs if he were limited to "light" level exertion, and also had the following non-exertional impairments.  (Tr. 537).  He: (1) could never crawl or climb ladders, ropes, or scaffolds; (2) could occasionally push and pull or use hand controls with his right arm and could occasionally reach overhead with his right arm or perform work activity above the shoulder level; (3) would be "moderately" impaired in understanding, remembering, and carrying out detailed instructions and

in his ability to respond appropriately to work pressures and changes in a routine work setting; and (4) would be "slightly" impaired in his ability to make judgments on simple work-related decisions and in his ability to interact appropriately with others, including co-workers, supervisors, and the general public. (Tr. 537-8).[1]  The VE responded that there were jobs that such a person could perform, and proceeded to give the numbers in which they existed in the state and national economies. (Tr. 539).

On appeal, this court must determine whether the hypothetical factors selected by the ALJ are supported by substantial evidence, and that they fairly depict the plaintiff's condition.  In addition, the plaintiff raises an issue regarding the termination of benefits he previously received between 1998 and July 1, 2002, when the benefits were ceased due to medical improvement.

Considering first the issue of the termination of the previous benefits, the Supreme Court in Califano v. Sanders, 430 U.S. 99, 107 (1997) held that a federal court is without jurisdiction to review the Secretary's (now the Commissioner's) decision to allow the reopening of a claimant's case in the absence of a "colorable constitutional claim."[2]

---

[1]"Moderately" was defined as "a moderate limitation in this area but still able to function satisfactorily."  "Slightly" was defined as "some mild limitations but the individual can generally function well."  (Tr. 538).

[2]Although the ALJ considered some evidence from the period before the onset date of October 1, 2002 alleged by Mr. Mullins in his current application (Tr. 94), the ALJ also stated at the most recent administrative hearing that the cessation of benefits

8

07-92  Mullins

The plaintiff puts forward several arguments for reopening.  For instance, he maintains that some of the medical decisions used to terminate his benefits were unsigned by any medical source (e.g., Tr. 45) and that the defendant erroneously concluded that he had not been seen by any physician or hospital in the past year (Tr. 68).  In other words, these arguments go to whether the cessation of benefits was supported by substantial evidence, a factor which is beyond the court's jurisdiction under Califano v. Sanders.  The Sixth Circuit has recognized that a colorable constitutional claim may be presented and provide a basis for reopening if a claimant's mental condition prevented the timely pursuit of his administrative remedies.  Parker v. Califano, 646 F.2d 1199, 1202-3 (6th Cir. 1981).  The plaintiff does not specifically allege that he failed to understand that his benefits had been terminated and that he had the right to appeal the decision as in Parker, however.  He was informed of his right to appeal (Tr. 71), and chose to file a new application. Therefore, the defendant's cessation of benefits became a final decision under 20 C.F.R. Section 404.987(a).  See Wills v. Secretary of Human Health and Services, 802 F.2d 870, 872 (6th Cir. 1986).  "Any determination that becomes final for failure to proceed to the next level of consideration may operate to bar future consideration of the claim."  Parker, 644 F.2d at 1202.

---

determination was not subject to reopening (Tr. 530) and specifically denied the plaintiff's request to reopen the determination in the hearing decision.  (Tr. 21). Therefore, this is not a case in which the prior determination was constructively reopened.

The court must still determine whether substantial evidence supports the ALJ's decision that the plaintiff was not under a disability for DIB purposes between October 1, 2002, his alleged onset date, and June 30, 2003, his Date Last Insured (DLI) (Tr. 94).  It must also determine whether there is substantial evidence to support a finding of no disability between the alleged onset date and May 3, 2006, the date of the ALJ's decision, for SSI purposes.

Mr. Mullins testified that his worst problem was dizziness and "blacking out," and he had great difficulty using his right shoulder which had been injured in an accident.  (Tr. 566).  He also had a right wrist injury which had been untreated.  (Tr. 571).  He stated that he had no difficulty with standing, stooping or lifting.  (Tr. 576).  He admitted playing golf recently, although he stated he could not do so more than once a month because of shoulder problems.  (Tr. 561, 564).   Regarding his psychological condition, Mr. Mullins testified that he had a brain hemorrhage at the age of 18 because of a head injury and a history of substance abuse problems, including marijuana, cocaine, and alcohol.  (Tr. 566, 574).  While he initially implied that the substance abuse problems were in the past, he admitted having three beers the previous day.  (Tr. 574-5).  He was being treated at a Comprehensive Care Center, and was given a medication called Geodon, which made him tired, restless, and overeat.  (Tr. 573, 575).  Asked about his history of sporadic mental health treatment, Mr. Mullins stated that he would forget what he was doing or develop a mood in which he did not want to be judged.  (Tr. 575).  He disliked

crowds and did not want anyone to know him (Tr. 577, 587), although he had an on-and-off relationship for six years with a girlfriend and had two children.  (Tr. 552, 578).  He had done some short-term work since his alleged onset date, including driving a tractor to help harvest tobacco and stuffing envelopes for his mother.  (Tr. 559, 565).  The plaintiff's mother testified that he had tried to help her out collecting money at her U-Haul rental office, but she thought he would have trouble keeping the schedule due to his nervousness and inability to sleep.  (Tr. 534-5).  She testified that after his head injury in 1995, the plaintiff was short-tempered, impulsive, and forgetful.  (Tr. 532-3).

The medical evidence shows that the plaintiff was examined at an emergency room in March, 2002 with a right shoulder injury after a tree fell on him while he was cutting it down.  (Tr. 205).  X-rays showed a Grade 3 acromioclavicular separation with no fractures, and he was advised to keep the arm in a sling until he followed up with an orthopedist.  (Tr. 205, 207).  The plaintiff sought treatment from Dr. Timothy J. Micek beginning in November, 2002, after he reinjured the shoulder attempting to lift a washing machine.  (Tr. 251).  Dr. Micek noted that the plaintiff had gone back to work after the initial injury, adding "he works in designer marble and does a lot of heavy lifting." (Id.).  Dr. Micek's examination showed a deformity of the right clavicle with mild generalized edema and x-rays confirmed an acromioclavicular joint separation.  (Id.).  Mr. Mullins was temporarily put on sedentary work with no heavy lifting, pushing, pulling, or overhead work.  (Tr. 252).

Dr. Micek performed surgery on the shoulder on January 3, 2003, and reconstructed the acromioclavicular joint. (Tr. 247-8). Mr. Mullins did well in follow-up, and by February 28, 2003 had only mild tenderness, a full range of motion, normal strength, and intact sensation. (Tr. 242). He described difficulty only with "heavy lifting" and had no other complaints. (Id.). Dr. Micek advised continuing with physical therapy and remaining on "light duty status at work," before coming back to the office in four to five weeks to discuss "releasing him for work." (Id.). There was no evidence of further follow-up. The ALJ's physical restrictions mirrored the conclusions of a state agency examining physician. (Tr. 319-28). The plaintiff does not challenge the physical restrictions on appeal.[3]

Regarding Mr. Mullins's mental impairments, evidence from before the relevant period indicates that he was examined for a closed head injury after falling off a pickup truck on October 20, 1995. (Tr. 487). He informed a physician, Dr. Phillip Tibbs, that he drank alcohol "constantly" and was being treated by a psychiatrist for a problem which was most probably a manic-depressive disorder. (Id.). Previously, he had told an examiner that he had been intoxicated when he fell off the truck, and used marijuana daily. (Tr. 491). A CT scan of the brain did show a frontal contusion but he did not have any neurological symptoms and was discharged in stable condition. (Tr. 488). He was immediately readmitted to

_____

[3]The plaintiff was seen at the Samaritan Hospital emergency room in May, 2003 for a sore ankle after he "fell off a sea wall in Florida." (Tr. 353). An x-ray showed no fracture. (Tr. 356).

another hospital after becoming nauseated, but another CT scan of the head showed a resolving intracranial contusion of the right frontal area with no evidence of increased intracranial pressure. (Tr. 361, 363). The physician thought that Mr. Mullins could be managed at home, but complied with the family's wish for a psychiatric referral. (Tr. 363).

Records from the Bluegrass Regional Mental Health clinic show that Mr. Mullins was seen in 1998 with a history of a significant head injury which it was thought might necessitate a neuropsychiatric evaluation (Tr. 335), but his case was closed in January, 1999 (Tr. 336). In 2001, he was seen again with situational complaints after losing his house and girlfriend, but it is not clear if there was any follow-up. (Id.). The plaintiff was admitted to the Ridge Behavioral Health System (Ridge) shortly thereafter with feelings of depression and suicidal ideation, but he failed to return and could not be assessed by a physician. (Tr. 366). His drug abuse history was recorded as including current use of marijuana and alcohol and recent use of barbiturates, hallucinogens, and cocaine. (Tr. 381). In April, 2002, the plaintiff was admitted at Ridge for three days, apparently due to hallucinations and racing thoughts. (Tr. 209). The physician noted a history of multiple psychiatric and rehab admissions. (Id.). He was evasive about his history of drug and alcohol abuse, but claimed he had been sober for the past three months. (Id.). He also noted a history of having seizures due to head trauma, most recently two weeks ago, and was very angry that his girlfriend would not allow him to see his two

13

children.   The physician felt that the plaintiff had impaired concentration, fair judgment, and poor insight, and provided an admission diagnosis of a mixed bipolar disorder with a Global Assessment of Functioning (GAF) score of 25.  (Tr. 211).  A GAF score of 25 indicates behavior considerably influenced by delusions or hallucinations, or serious impairment in communication or judgment, or inability to function in almost all areas.  Diagnostic and Statistical Manual of Mental Disorders (4th Ed.--Text Revision) (DSM-IV-TR), p. 34.  Laboratory screening was positive for cocaine and marijuana.  (Tr. 211).  Mr. Mullins left the hospital against medical advice after three days with a diagnosis of bipolar disorder; the GAF was not updated.  (Tr. 212).  No functional restrictions are given.

Mr. Mullins underwent a consultative examination by Psychiatrist Gary C. Stewart on April 30, 2003.  (Tr. 273).  He gave a history of a head injury and of hospitalizations for depression, but no records were available for review.  (Tr. 274). He complained of fatigue, irritability, anhedonia and dysphoria, and described trouble coping.  Mr. Mullins admitted using alcohol and drugs in his teens, although he claimed not to excess, but admitted having two arrests for public intoxication and having been in two drug/alcohol treatment programs.  (Id.).  He reported problems relating to other people and with controlling his temper, but said he did not have difficulty learning job responsibilities and had never been fired.  (Tr. 275).  Dr. Stewart noted no problems with mental therapy or in understanding complex directions.  (Tr. 273).  Mr. Mullins was oriented, showed no problems with attention

and concentration, and was cooperative.  (Tr. 273, 276).  His estimated intellectual functioning was in the borderline range.  Dr. Stewart diagnosed a recurrent major depressive disorder, alcohol abuse "by history" and mixed personality traits, with a current GAF score of 51-60.  (Tr. 276).  A GAF score in this range reflects only "moderate" symptoms per the DSM-IV-TR.  Dr. Stewart considered Mr. Mullins to be moderately to markedly impaired by psychological factors, but a primary factor for this was said to be his poor motivation.  (Tr. 277).  He would have a poor ability to work with the general public, deal with stress and change, and demonstrate reliability and a "fair" ability to perform complex functions, meet deadlines, and carry out social functioning.  (Id.).  The terms "poor" and "fair" were not defined.

Subsequently, additional records from Bluegrass Mental Health were admitted, showing that the plaintiff was treated for several months in the summer of 2005 due to his concerns about racing thoughts, seeing and hearing things, and anxiety.  (Tr. 337-48).  He was not on medications, but said he had been drinking daily until quitting "a couple of weeks ago."  (Tr. 337).  The initial impressions included an anxiety disorder, attention deficit hyperactivity disorder by history, cannabis abuse, alcohol abuse, as well as "rule out" other conditions such as bipolar disorder and schizophrenia.  (Tr. 338).  Later, he was assigned a GAF of 60 by a clinical social worker, with the same diagnoses being listed.  (Tr. 342).  On July 13, 2005, Mr. Mullins described spending 45 minutes picking roots, and being involved in two fights in the past two weeks, on one occasion while playing golf at

a country club.  (Tr. 344).  The most recent note is dated August 23, 2005, at which time the plaintiff stated that he was proud of not abusing substances and hoping that the medication that he had just started would help him sleep.  (Tr. 347).  He also reported that he had been "working a lot," which helped him.  (Id.).  An undated note from the same source lists a GAF of 65-75 (Tr. 348), which would represent mild to slight impairment per the DSM-IV-TR.

Dr. Dennis Sprague, another psychologist, examined Mr. Mullins on November 10, 2005, and reviewed prior records from various sources.  (Tr. 466-7). He stated he was under the care of a Dr. Ali at Comprehensive Care in Scott County and was on the medication Risperdal.  (Tr. 467).  He denied having worked actively for the past several years, and was described as quiet, defensive, and withdrawn.  (Tr. 467-8).  He obtained a full scale IQ score of 79, with a post high school reading ability, high school spelling ability, and third grade arithmetic ability. (Tr. 469).  Some self-scoring tests were administered showing significant depression and moderate anxiety with no indication of malingering.  (Tr. 471).  Dr. Sprague's impression was given as "rule out" cognitive disorder, a major depressive disorder, polysubstance abuse "current status unknown," "bipolar symptoms with no diagnosis rendered," and "personality traits."  (Id.).  The highest GAF in the past year was said to be 52.  (Tr. 473).  Dr. Sprague completed a mental medical assessment form in which he opined that the plaintiff would have a "severely limited but not precluded" ability to make judgments on simple work-related decisions, and

16

interact appropriately with the public, supervisors, and co-workers.  (Tr. 475).  In other areas he was said to be capable of functioning at least satisfactorily.

The ALJ submitted the evidence to a Medical Expert (ME), Doug McKeown, a psychologist.  He stated that the evidence established treatment and intervention for substance use and bipolar symptoms of depression and possible hallucinatory experiences.  (Tr. 478).  There were indications of a history of poor compliance with treatment and perhaps continued use of illegal substances.  Dr. Sprague had found high borderline intellectual functioning with reasonable achievement skills, and there was no evidence of consistent follow-up treatment except for taking Risperdal.  (Id.).  There was support in the record for his suggestions of difficulty with bipolar disorder and depression, but the ME opined that failure to follow up in treatment and failure to avoid illicit substances appeared to be primary contributors to his failure to improve.  (Tr. 481).  There would be evidence going back to at least 2001 showing limitations on work-related activities, but substance abuse symptomology was both material and contributory back to that date as well.  (Id.).  There was no evidence that the "B" criteria of any of the Commissioner's Listings of Impairment were met.  (Id.).  McKeown also prepared a mental medical assessment form which indicates no more than a moderate limitation in any area (Tr. 482-4), consistent with the ALJ's hypothetical question.

The ALJ found that Mr. Mullins did have impairments, but his testimony regarding the intensity and persistence of the symptoms was not supported by

objective evidence.  He noted that at the administrative hearing, the plaintiff had asserted that his substance abuse problem had been in remission for two months, but then made an exception for drinking three beers shortly before the hearing, and that there was still no indication of consistent follow-up treatment or compliance with psychiatric treatment.  (Tr. 29).  His activities of daily living included living in an apartment, attending to personal needs, driving, cooking, washing dishes, doing household chores, mowing grass, fishing, and playing golf, and were inconsistent with his alleged limitations.  (Id.).

The plaintiff objects that the ALJ rejected the opinion of his treating physician, but no treating mental health source provided any restrictions or stated that he was disabled.   The plaintiff also objects that the two consultative examinations supported his allegations of disability, and that it was erroneous to rely on the ME because he had not personally evaluated Mr. Mullins and because his opinion that the plaintiff had not been under disability since 2001 was "contradicted by the SSA's own finding of disability at least through July, 2002."  Docket Entry No. 6, p. 29.

As the Commissioner points out, the regulations permit the ALJ to seek an opinion from an ME.   20 C.F.R. Sections 404.1527; 416.927.   Sixth Circuit precedent has recognized the use of such experts.  Atterberry v. Secretary of Health and Human Services, 871 F.2d 567, 570 (6th Cir. 1989).  The plaintiff submits that the use of this ME was improper because he was not licensed to practice

psychology in Kentucky.  While the regulations at 20 C.F.R. Section 404.1519g indicate that a qualified medical source for a consultative medical examination must be currently licensed in the state, the plaintiff has not cited to any regulation or case law holding that it is improper for an opinion to be obtained from an out-of-state expert.   Counsel for the plaintiff suggests that the Kentucky Psychological Association considers it unethical for a member to express an opinion regarding an individual who has not been personally examined, but given the specific regulatory and Sixth Circuit approvals of such opinions, this argument does not provide a basis for remand.

Regarding the plaintiff's argument that the ME determined that the plaintiff was not disabled in 2001, and that this was inconsistent with his receiving benefits through the middle of 2002, the court notes that the ME indicated that substance abuse symptomology was material "at least to 2001 but would not provide sufficient evidence to indicate that he would meet a Listing for substance abuse through that period." (Tr. 481).  Stating that the plaintiff did not meet a Listing for substance abuse in 2001 is not equivalent to saying that he was not under a disability.  There is no conflict of any consequence.

Finally, the plaintiff objects that it was improper to accept the opinion of an ME when both of the consultative examiners appeared to indicate greater restrictions.  However, the ME had the benefit of a review of the entire record, which Dr. Stewart did not, and it is not clear to what extent the consultative examiners

07-92  Mullins

were basing their restrictions, at least in part, on polysubstance abuse, an improper factor for the award of benefits since the passage of Public Law 104-121.  As one-time examiners, neither Dr. Stewart nor Dr. Sprague was entitled to the weight accorded a treating source.  Moreover, as the Commissioner points out, recent treatment notes from Bluegrass Mental Health include at least one GAF score totally inconsistent with disability (Tr. 348), in addition to reflecting improvement in the plaintiff's mental and personal status from the beginning of treatment (Tr. 347).  In fact, it would appear that the ME was the only source who made a clear effort to distinguish the effect of possible substance abuse from functional limitations.  (Tr. 483-4).    Therefore, in addition to the plaintiff's testimony of recent beer consumption, the ALJ could reasonably have relied on the ME's opinion over that of the one-time examining sources.

The decision will be affirmed.

This the 29th day of February, 2008.


Signed By:

**G. Wix Unthank**

**United States Senior Judge**

20